UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

LEACH LOGISTICS, INC.,

                  Plaintiff,

    v.

CF USA, INC.,

                  Defendant.

Case No. 3:21-cv-00237-MMD-CLB

ORDER

CF USA, INC.,

                  Counter-Claimant,

    v.

LEACH LOGISTICS, INC.,

                  Counter-Defendant.

## I.  SUMMARY

This removed action arises from a dispute over the storage and milling of coffee cherries—an often-discarded portion of the coffee fruit distinct from the coffee bean. Plaintiff and Counter-Defendant Leach Logistics, Inc. ("Leach"), a commercial warehousing company, brings suit against coffee cherry producer CF USA, Inc. ("CF USA") seeking back rent and other damages related to large quantities of coffee cherry product stored at the Leach facility in Sparks, Nevada. (ECF No. 114 ("Third Amended Complaint").) CF USA brings counterclaims alleging that Leach's facility damaged the coffee cherry product by causing it to develop a spicy aroma, rendering it unmarketable. (ECF No. 116 ("Second Amended Counterclaim").) Before the Court are Leach's separate

1   motions[1] for summary judgment as to CF USA's counterclaims (ECF No. 124 ("Leach's

2   First Motion"))[2] and as to its own affirmative claims (ECF No. 126 ("Leach's Second

3   Motion"))[3]. Also before the Court is CF USA's motion for partial summary judgment. (ECF

4   No. 125 ("CF USA's Motion").)[4] As explained below, genuine and interdependent disputes

5   of material fact remain regarding the majority of both Leach's claims and CF USA's

6   counterclaims. Accordingly, the Court denies Leach's First and Second Motions. The

7   Court grants CF USA's Motion as to Leach's claim for fraudulent inducement only and

8   denies it as to all other claims.

9   **II.    BACKGROUND**

10       The following facts are undisputed unless otherwise noted.[5] Plaintiff Leach is a

11   milling, commercial warehousing and processing company. (ECF No. 126-3.) Defendant

12   CF USA is the United States subsidiary of Canada-based parent company CF Global

13   Holdings ("CF Global").[6] (ECF No. 125-4.) While some of the history of CF USA's

14

15       [1]Leach filed a motion for leave to file separate affirmative and defensive summary
    judgment motions, exceeding the page limit set by LR 7-3. (ECF No. 123.) In order to
16   address the merits of the parties' motions, the Court finds good cause to permit this
    deviation from the Local Rules on a one-time basis. *See* LR 7-3(c); *Gennock v. Warner-*
17   *Lambert Co.*, 208 F. Supp. 2d 1156, 1158 (D. Nev. 2002); *Veterinary Ventures, Inc.*, 2010
    WL 3070423, at *2 (D. Nev. Aug. 3, 2010). The Court thus grants Leach's motion (ECF
18   No. 123). The Court cautions, however, that future requests to deviate from the Local
    Rules' page requirements are discouraged; many portions of the extensive summary
19   judgment briefings in this case are duplicative.

20       [2]CF USA responded (ECF No. 132) and Leach replied (ECF No. 136).

21       [3]CF USA responded (ECF No. 133) and Leach replied (ECF No. 137).

22       [4]Leach responded (ECF No. 134) and CF USA replied (ECF No. 135).

23       [5]To the extent the parties object to certain evidence, the Court addresses those
    objections in its discussion of the substantive arguments to which that evidence is
24   pertinent. Where factual exhibits are attached to multiple motions or responsive filings,
    the Court cites to those exhibits' locations as introduced by the parties where relevant
25   and otherwise cites to them interchangeably.

26       [6]The parties have disputed the identity of the proper defendants/counterclaimants
    throughout this litigation, and the Court has repeatedly noted a lack of clarity about CF
27   USA and its associated entities' corporate structure, especially because many
    communications occurred through the "Coffee Cherry Company," a corporate alias. (ECF
28   Nos. 83, 109, 110.) The Court ultimately dismissed CF Global Holdings, permitting CF
    USA to assert amended counterclaims only on its own behalf. (ECF Nos. 109, 110.) The

formation is contested, the record indicates that prior to CF USA's formation in early 2015, parent company CF Global formed from a partnership between two global coffee trading companies, Ecom Agroindustrial Corp., Ltd. ("Ecom") and Mercafe Trading Corp. ("Mercon"), and investor NohBell, Inc., with founder Daniel Belliveau. (ECF Nos. 125-2, 125-4, 125-7.) CF USA aimed to "upcycle" and build a market for novel coffee cherry products. (ECF No. 125-7.) Coffee cherry (also referred to as "coffee husk" or "cascara") is a part of the coffee plant historically discarded during the harvesting of coffee beans, but it can be milled into a powder and used as a filler ingredient in baked goods. (*Id.*)

CF USA ultimately entered into an agreement with Leach to warehouse and mill coffee cherry, as well as to distribute the resulting "coffee flour." (ECF Nos. 116, 125-5.). It is undisputed that there has never been a formal written contract between Leach and CF USA, and that the only terms of the original agreement and subsequent modifications committed to writing pertain to Leach's monthly rental fees. (ECF Nos. 124, 125, 126-15 at 3-7, 126-27 at 2.) Leach set these fee rates in part based on CF USA's volume representations. At the time of the initial agreement, CF USA communicated to Leach that it planned to move "millions" of pounds of coffee cherry product every year; CF USA specifically estimated that Leach should expect 30 shipping containers at 30,000 to 35,000 pounds per container, but that "not all of [the product] will come or go to the United States." (ECF Nos. 125-9 at 8, 125-11 at 5.) Between 2015 and 2021, CF USA relocated more than a million pounds of coffee cherry to the Leach facility but sold very little. (ECF Nos. 126-3, 126-5, 126-11.) Given the product's limited movement, Leach increased its rates on several occasions, including by email in November 2019. (ECF Nos. 126-12, 126-13, 126-15.) The 2019 rate increase is the operative agreement underlying the claims in this action.

CF USA and Leach dispute facts about the discussions that led to CF USA and Leach's initial agreement and whether the content of those discussions involved storage

---

parties continue to dispute whether CF USA in fact owned the coffee cherry product in question. The Court will refer to CF USA as the contracting party throughout for clarity, notwithstanding the ongoing ownership dispute.

specifications beyond the agreement's sparse written payment terms. The parties largely agree, however, that the original arrangement was established primarily by NohBell, acting on behalf of CF Global or CF USA. (ECF Nos. 124-7 (Dep. Charles Clemente, in his capacity as 30(b)(6) witness for CF USA), 124-8 (Dep. Charles Clemente, in his capacity as 30(b)(6) witness for CF Global).) NohBell's Ad Verkuylen was a key NohBell representative involved in early discussions. (*Id*.) Verkuylen himself testified that he never personally discussed long-term storage of the coffee cherry product at Leach nor negotiated any specific agreement as to liability for flavor degradation, but that he did ask numerous prequalification questions and inform Leach that the cross-contamination risk is high for coffee products around other odorous products. (ECF Nos. 124-13, 125-8 at 5-6.) He further testified that the business relationship between the coffee cherry developers and Leach evolved over time, and "grew from doing testing [and evaluating] different grinding methods." (ECF No. 124-13 at 3.)

Between 2015 and September 2020, CF USA paid monthly rental fees and experienced no problems with the storage of its product. (ECF No. 125 at 14.) This relatively stable relationship ceased, however, by the spring of 2020. In May 2020, Leach sent CF USA a 30-day notice to remove its product and requested that all invoices be paid in full, citing CF USA's low sales and recent unpaid invoices. (ECF No. 126-18.) In further email communications, CF USA proposed a slower timeline due to inadequate cash reserves and Leach asked for a deposit to move the product, but the parties were unable to reach a resolution. (ECF Nos. 126-18, 126-19.)

In the fall of 2020, several customers indicated concern in emails to CF USA's employees about a new and unpleasant savory flavor in recent shipments which was unlike the flavors in previous shipments. (ECF Nos. 125-16, 125-17.) The customers described this foreign flavor as containing notes of "oregano, bay and paprika." (ECF No. 125-16, 125-17.) In a declaration, the admissibility of which Leach disputes, CF USA culinary liaison Erin Coyle-Brannan states that CF USA began investigating these reports of adulteration in the fall of 2020, including by "testing samples that the Company had

4

received from Leach and comparing the time periods that the samples appeared to have been commercially adulterated" and that, because of high rates of adulteration, she was "no longer confident that any of the . . . product being stored at Leach would meet the Company's organoleptic (taste and smell) standards." (ECF No. 125-13 at 3-4.) In January 2021, CF USA's then-CEO, Tom Clemente, visited the Leach facility and testified that the facility was "inundated with [the smell of] Italian seasoning." (ECF No. 125-18 at 5.) Leach's expert similarly reported an "obvious herbaceous scent" in the environment, although she also reported that the smell was not unpleasant. (ECF No. 125-20 at 17.)

In April 2021, CF USA informed Leach that it was formally terminating its relationship due to contamination of the coffee cherry and warned Leach not to destroy the product currently stored at the facility. Leach in turn demanded fees for past storage and removal. (ECF Nos. 126-24, 126-25.) CF USA refused, stating it would not arrange to remove "valueless" product. (ECF No. 126-27.)

Around the same time, CF USA also sent a limited number of coffee cherry samples to Anthony Tellin, head taster of the Anthony Tellin Company ("ATCO"), for sensory analysis. (ECF No. 125-19.) Tellin prepared a report in June 2021 which indicated that "[t]he majority of samples submitted are adulterated with a savory aroma and or flavor profile not found naturally in cascara" and that this "off aroma range[d] from slight . . . to very noticeable, almost dominant, and is akin to Italian seasonings found in pizza and or crackers." (*Id.* at 3.) The parties dispute the validity of Tellin's testing, and Leach objects to the admissibility of the report and CF USA's attempt to qualify Tellin as an expert.

Based on CF USA's failure to pay storage fees and to timely remove the coffee cherry from the warehouse, Leach asserts five causes of action against CF USA in the operative Third Amended Complaint: (1) breach of contract; (2) contractual breach of the implied covenant of good faith and fair dealing; (3) fraud in the inducement/quantum meruit; (4) unjust enrichment; and (5) trespass. (ECF No. 114.) Based on Leach's alleged role in contaminating the coffee cherry, CF USA asserts counterclaims for (1) breach of

1    contract and (2) contractual breach of the implied covenant of good faith and fair dealing

2    in its Second Amended Counterclaim. (ECF No. 116.) Leach now moves for summary

3    judgment as to four of its five affirmative claims[7] (ECF No. 126 (Second Motion)), as well

4    as summary judgment as to CF USA's counterclaims (ECF No. 124 (First Motion)). CF

5    USA, meanwhile, moves for summary judgment in its favor as to (1) CF USA's own

6    express breach of contract claim, with the quantity of damages to be determined at trial;

7    (2) Leach's express breach of contract claim; and (3) Leach's fraud in the inducement

8    claim. (ECF No. 125.) The Court finds that genuine disputes of material fact preclude

9    summary judgment for either party as to all but Leach's fraudulent inducement claim.

10   **III.    DISCUSSION**

11           To avoid repetition, the Court will address the motions as they pertain to each claim

12   and counterclaim, while bearing in mind the parties' burdens on summary judgment. *See*

13   Fed. R. Civ. P. 56 (providing that summary judgment is appropriate "if the movant shows

14   that there is no genuine dispute as to any material fact and the movant is entitled to

15   judgment as a matter of law"). *See also Celotex Corp. v. Catrett*, 477 U.S. 317, 330

16   (1986); *Kaiser Cement Corp. v. Fishbach & Moore, Inc.*, 793 F.2d 1100, 1103 (9th Cir.

17   1986) (a court must view all facts and draws all inferences in the light most favorable to

18   the nonmoving party). The Court first evaluates the motions with respect to all contract-

19   based claims. The Court next turns to Leach's remaining claims for fraudulent

20   inducement, unjust enrichment, and trespass.

21           **A.    Express Breach of Contract Claims**

22           The parties each separately move for summary judgment on both Leach's breach

23   of contract claim and CF USA's breach of contract counterclaim. (ECF Nos. 124 at 14-

24   17; 125 at 14-21, 22; 126 at 10-11.) Because the two express contractual breach claims

25   involve the same elements and intertwined legal and factual issues, the Court addresses

26   them together.

27

28           [7]Neither party moves for summary judgment as to Leach's affirmative claim for
     breach of the implied covenant of good faith and fair dealing.

To prevail on a breach of contract claim under Nevada law, a plaintiff must establish "(1) formation of a valid contract; (2) performance or excuse of performance by the [moving party]; (3) material breach by the defendant; and (4) damages*." Laguerre v. Nevada Sys. of Higher Educ.*, 837 F. Supp. 2d 1176, 1180 (D. Nev. 2011) (citing *Bernard v. Rockhill Dev. Co.*, 734 P.2d 1238, 1240 (Nev. 1987) ("A breach of contract may be said to be a material failure of performance of a duty arising under or imposed by agreement.")). "When parties exchange promises to perform, one party's material breach of its promise discharges the non-breaching party's duty to perform." *Cain v. Price*, 415 P.3d 25, 29 (Nev. 2018). Because a material breach of contract also gives rise to a claim for damages, an injured party is "both excused from its contractual obligation and entitled to seek damages for the other party's breach." *Id*. Formation of a valid and enforceable oral contract requires mutual assent to the contract's essential terms. *See Grisham v. Grisham*, 289 P.3d 230, 235 (Nev. 2012). In general, preliminary negotiations do not create a binding contract unless all parties have agreed to the material terms. *See May v. Anderson*, 119 P.3d 1254, 1257 (Nev. 2005).

Because the Court finds that material disputes of fact remain as to (1) the terms of the storage contract, (2) whether and when Leach breached the contract, and (3) whether any breach by Leach excused CF USA's performance, the Court will deny both parties' motions as to the express contractual breach claims.

### 1. CF USA's breach of contract counterclaim (ECF No. 116 at 21-22)

The Court begins by analyzing CF USA's breach of contract counterclaim against Leach, because whether Leach breached the contract by failing to maintain the integrity of the coffee cherry is also relevant to the elements of Leach's affirmative breach claim to the extent it bears on whether CF USA's own performance was excused. *See Cain*, 415 P.3d at 29 (noting that one party's material breach discharges the non-breaching party's duty to perform). CF USA argues that, as a matter of law, the agreement between Leach and CF USA constitutes a bailment contract and that Nevada's version of the

1    Uniform Commercial Code ("UCC") further applies to establish a framework for
2    warehouse liability when goods are damaged. (ECF No. 125 at 14-21.) Leach
3    independently moves for summary judgment on the same counterclaim, contending that
4    basic contract building blocks—offer and acceptance, meeting of the minds, and
5    consideration—are lacking as to CF USA's allegations, and that Leach had no contractual
6    obligation to ensure the product was maintained free of contamination. (ECF Nos. 116 at
7    21-22; 124 at 14.)

8                          a.      Nature of the contract

9           As a foundational matter, there is no genuine factual dispute as to the existence of
10   a contract between Leach and CF USA, despite the absence of a formal written
11   agreement.[8] Indeed, Leach and CF USA each proceed under a shared presumption that
12   a valid contract existed and that, at minimum, written communications required CF USA
13   to pay monthly rental fees as a term of the contract.[9] At early meetings, Leach and CF
14   USA-affiliated representatives explicitly discussed pricing based around milling volume,
15   and concurrently tested various product grinds at the Leach facility. (ECF No. 125-12 at
16   3-5.) CF USA began to pay monthly storage fees. (ECF Nos. 125-12 at 3-5; 126-27 at 2.)
17   In September 2019, after at least one prior increase, Leach proposed new rates for its
18   warehousing services in written email exchanges. (ECF No. 126-15 at 2-3.) CF USA
19   accepted the rate change and continued to pay storage fees after that time. (ECF Nos.
20   126-15 at 3-7, 126-27 at 2.) Between 2015 and 2020, CF USA paid monthly fees and
21   experienced no issues with the warehousing of its product. (ECF No. 125 at 14.) These
22   facts demonstrate the formation of a contractual relationship, and the performance of that

23

24          [8]Although Leach asserts in moving for summary judgment on CF USA's express
     breach counterclaim that there was "no formation of a valid, oral contract due to lack of
25   definite material terms" (ECF No. 124 at 14), Leach maintains in its pleadings and motions
     that *CF USA* breached a storage contract. (ECF No. 126 at 10.) This indicates that,
26   regardless of any debate over its terms, Leach acknowledges and relies on the existence
     of some form of contract.
27

28          [9]The Court has also previously observed, in its oral ruling on Leach's motion to
     dismiss, that the parties do not dispute the existence of a contract but only whether the
     conduct amounts to a breach of contract. (ECF No. 110.)

contract by both parties over the course of multiple years. In addition, none of the limited written communications between the parties about rental payments included a merger or integration clause indicating a final agreement and precluding oral modifications.

Given the formation of a valid contract, CF USA's counterclaim depends on whether and to what extent the terms of that contract included any obligation on the part of Leach to preserve the quality of the coffee cherry product under certain conditions. CF USA argues that Nevada's version of Article 7 of the UCC, as codified in NRS § 104, governs warehousers as bailees of product and imbues all warehousing contracts, including this one, with specific obligations as a matter of law. (ECF No. 125 at 17.) This is in large part a legal question.

The UCC, as adopted in Nevada and other states, provides default standards for commercial transactions and generally applies between merchants, although "the effect of provisions of the [UCC] may be varied by agreement." NRS § 104.1302(1). *See also* NRS § 104.1201(l) (defining a "contract" as "the total legal obligation that results from the parties' agreement as determined by [this section] as supplemented by any other applicable laws"). Nevada's version of UCC Article 7 specifically provides that "[a] warehouse is liable for damages for loss of or injury to the goods caused by its failure to exercise care with regard to the goods that a reasonably careful person would exercise under similar circumstances." NRS § 104.7204(1).[10] NRS § 104.7204(2) also provides that "[d]amages may be limited by a term in the warehouse receipt or storage agreement limiting the amount of liability in case of loss or damage beyond which the warehouse is not liable." Nevada appellate courts have not explicitly interpreted these warehousing provisions. *See Chandra v. Schulte*, 454 P.3d 740, 743 (Nev. 2019) (providing that "[w]here a statute is clear and unambiguous, [the Nevada Supreme Court] gives effect to the ordinary meaning of the plain language of the text without turning to other rules of construction").

---

[10]A "warehouse" is defined as "a person engaged in the business of storing goods for hire." NRS § 104.7102(1)(k).

9

Under NRS § 104.7204's commercial warehouse provision, an owner of goods is—by definition—a bailor, and a contracted warehouser is a bailee. *See* NRS § 104.7102(1)(a) (defining a "bailee" for purposes of this section as a "person that by a warehouse receipt . . . or other document of title acknowledges possession of goods and contracts to deliver them"); NRS § 104.7204(2) (providing that a "bailor" making an agreement for the storage of their goods may make certain requests as to liability). Although requirements for common-law bailments may sometimes differ from UCC-based law, the principles applicable to bailments broadly are also relevant in the context of warehousing agreements. *See, e.g.*, *Manhattan Fire & Marine Ins. Co. v. Grand Cent. Garage*, 9 P.2d 682, 683 (Nev. 1932) (emphasizing that historically, a bailee to whose "possession, control, and care" goods are entrusted is responsible for maintaining those goods or accounting for their loss); 8A Am. Jur. 2d Bailments § 31 (noting that where "one person has lawfully acquired the possession of the personal property of another and holds it under circumstances whereby that person ought, upon principles of justice, to keep it safely and restore it or deliver it to the owner," the parties to that transaction are generally treated as bailee and bailor by operation of law).[11]

The Court finds that CF USA adequately pleads the breach of a bailment contract in its Second Amended Counterclaim. CF USA specifically alleges that (1) "Leach offered to store product for Counterclaimant, which was accepted by Counterclaimant for the consideration of paying for the storage or other services as invoiced by Leach"; that (2) "during the time Leach had possession of the product for the mutual benefit of [both parties]"; and that (3) "the product was damaged and tainted by external elements that damaged the product's flavor profile and caused the total loss of the product while in Leach's possession and control." (ECF No. 116.) The Court further finds that Leach and

---

[11]As with other kinds of contracts, "an express agreement will prevail against general principles of law applicable in the absence of an express agreement, and it is improper to imply obligations except in the absence of express contractual terms." 8A Am. Jur. 2d Bailments § 29. While the parties to a bailment contract may supersede the law of bailment by express language, however "the bailee may not do so by words of doubtful meaning; the intent to vary the liability imposed by law must clearly appear." *Id.*

1    CF USA entered a bailment contract as a matter of law by contracting for the storage of

2    coffee cherry product and through Leach's undisputed possession of that product. *See*

3    *Manhattan Fire & Marine Ins. Co.*, 9 P.2d at 683; 8A Am. Jur. 2d Bailments § 33 (gathering

4    cases indicating that the bailment relationship does not depend upon the invocation of

5    particular words or mutual assent to the relationship).

6          Leach argues that CF USA improperly attempts to use bailment to re-plead tort-

7    based negligence claims in violation of the Court's previous ruling dismissing such claims

8    with prejudice and permitting CF USA to amend only its contract-based claims.[12] (ECF

9    Nos. 9, 10, 134 at 21-27.) But while the Court has prohibited CF USA from asserting new

10   negligence claims or theories sounding in tort, bailment and UCC-based claims cannot

11   easily be categorized as "duty-based tort claims." Bailment is an arena where contract

12   and tort law overlap, and where causes of action often exist in both contract and tort.[13]

13   *See* 8A Am. Jur. 2d Bailments § 219 (summarizing cases across jurisdictions to note that

14   "a bailor may allege distinct wrongs sounding in contract and in tort"). Bailment arises as

15   a contractual relationship, however, and Nevada courts have regularly allowed parties to

16   plead *breach of bailment contract* claims while also noting the particular duties inherent

17   in a bailment relationship. *See Bramlette v. Titus*, 267 P.2d 620, 622 (Nev. 1954) (finding

18   that an appellant properly brought a cause of action which "sound[ed] in contract" based

19   on a bailment theory, regarding respondents' failure to re-deliver cattle where the bailed

---

21   [12]The Court previously dismissed CF USA's tort counterclaims in its oral ruling on
22   Leach's motion to dismiss. (ECF Nos. 109, 110.) In their briefings on that motion, the
     parties limited the discussion of CF USA's counterclaim for "negligent destruction of
23   property – bailor/bailee liability" to the application of the economic loss doctrine in
     common-law negligence actions. (*Id.*) The Court found that CF USA's negligence
24   counterclaim was barred by the economic loss doctrine, stating in its oral ruling that it was
     dismissing all claims with prejudice "to the extent [they are tort-based]" and emphasizing
     specifically that Leach could not bring claims for common-law negligence or punitive
25   damages. (ECF No. 110.) The Court permitted CF USA to re-plead its contract and
     contractual breach of good faith and fair dealing claims and warned CF USA that deviation
26   from the permitted amendment would result in dismissal of its entire counterclaim with
     prejudice. (*Id.*)

27   [13]*See also* 8A Am. Jur. 2d Bailments § 204 ("A bailment relationship does not
     create a specific cause of action but instead allows the bailor to choose the specific relief
28   for a breach of the bailment contract.").

property was damaged by the bailee); *Manhattan Fire & Marine Ins.*, 9 P.2d at 683 (finding that a prima facie case for "breach of contract of bailment for hire" required an appellant to show a bailment contract and the failure of a bailee to redeliver property, after which the burden was on the respondent to show absence of negligence). *C.f. Mutual Serv. Casualty Ins. Co. v. Elizabeth State Bank*, 265 F.3d 601, 616 (7th Cir. 2001) (explaining that in the context of a bank and its depositors, "the duty of care is one implied into the agreement between bank and depositor; it is a duty, in other words, that depends upon the existence of a contract"); *InjuryLoans.com, LLC v. Buenrostro*, 529 F. Supp. 3d 1178, 1185 (D. Nev. 2021) (explaining that a bank's duty of care *arises by contract* and is therefore limited to its customers).

While Leach points to decisions in this circuit and elsewhere where courts have interpreted bailment claims under the law of negligence, these cases are not inconsistent with the view that causes of action may be available in *both* contract and tort. *See, e.g.*, *Starbucks Corp. v. Amcor Packaging Distribution*, Case No. Civ. 2:13-1754 WBS, 2015 WL 237141, at *2 (E.D. Cal. Jan. 16, 2015) (finding that California's parallel provisions of UCC Article 7 supported a claim for negligence, but not addressing whether a claim could also be brought in contract and noting that California courts sometimes permit both kinds of claims to proceed). Similarly, the Court is unconvinced by Leach's argument that CF USA's reliance on NRS § 104.7204(1) and bailment runs afoul of the economic loss doctrine like CF USA's already-dismissed tort claims. The economic loss doctrine is intended is to prevent excessive tort liability where duties are *already defined by contract law*—not to remove claims involving certain duties from the realm of contract law altogether.[14] Nevada's commercial code governs commercial warehousing contracts,

---

[14]Notably, Nevada courts have emphasized that the purpose of the economic loss doctrine is to leave some duty-based claims to the realm of contract law and thus "to shield defendants from unlimited liability for all of the economic consequences of a negligent act, particularly in a commercial or professional setting, and . . . to keep the risk of liability reasonably calculable." *Terracon Consultants W., Inc. v. Mandalay Resort Grp.*, 206 P.3d 81, 83 (Nev. 2009). *See also BRW, Inc. v. Dufficy & Sons, Inc.*, 99 P.3d 66 (Colo. 2004) (holding that the economic loss doctrine barred a plaintiff's tort claim against

imposes default duties, provides for damages liability, and expressly permits warehouses to limit default liability by contract. *See* NRS § 104.7204. It thus defines relevant contractual duties and liabilities and allows parties to contract around them; it does not permit excessive and duplicative tort liability as an independent negligence theory might.

The Court is also unconvinced by Leach's argument that CF USA improperly rests on a new theory at the summary judgment stage and that this equates to "trial by ambush."[15] (ECF No. 134 at 25-26.) As the Court has already explained, CF USA's allegations in the counterclaim fall under the umbrella of breach of contract, which the Court expressly permitted CF USA to re-plead. (ECF Nos. 109, 110.) And regardless, the allegations in the counterclaim support a bailment relationship as a matter of law independent of any new facts introduced at the summary judgment stage. Leach thus had notice of the nature of the claims against it and has had an opportunity to contest the application of UCC and bailment theories. *See Schuck v. Signature Flight Support of Nevada, Inc.*, 245 P.3d 542, 544 (Nev. 2010) (finding it inappropriate to assert that a bailment existed *on appeal* given that a finding that a bailment existed could impact the burden of persuasion). Finally, the basic application of Nevada's commercial code should not come as a surprise to Leach. *See* NRS § 104.1103 (describing the section's broad applicability and noting that it should be liberally construed to promote its purposes, which include "[t]o simplify, clarify and modernize the law governing commercial transactions"). CF USA has not waived the application of Nevada statutory and common law simply by not expressly informing Leach of that law.

Having found a bailment contract, the Court briefly addresses the additional issue of the parties' respective burdens of proof. CF USA points to Nevada law imposing a

---

an engineering firm because the parties' contracts sufficiently defined the engineering firm's duties).

[15]Leach notes that the UCC is never mentioned in the three counterclaims filed by CF USA nor in the motions regarding dismissal of duty-based claims. (ECF No. 134 at 26.) Leach further emphasizes that the Court dismissed a counterclaim which included "bailor/bailee" in its heading, and that CF USA did not re-plead a counterclaim that explicitly mentions bailment. (*Id.*)

1    rebuttable presumption that when a product is damaged in the possession control and

2    possession of a bailee, the damage is the fault of the bailee. *See Gaudin Motor Co. v.*

3    *Wodarek*, 356 P.2d 638, 639 (Nev. 1960); *Alamo Airways, Inc. v. Benum*, 374 P.2d 684,

4    686 (Nev. 1962) (providing that "where the property is delivered in good condition to the

5    bailee and returned by him in a damaged state, a presumption [then] arises that the

6    damage is due to the bailee's fault," and that "unless [the bailee] sustains the burden of

7    proving that such damage was due to other causes consistent with due care on his part,

8    the bailor becomes entitled to judgment as a matter of law"). But while Nevada courts

9    have addressed bailor/bailee presumptions in the context of common-law bailment

10   actions, they have not directly applied the analysis under NRS § 104.7204. Notably,

11   courts in other jurisdictions have also declined to apply the presumption in cases involving

12   perishable goods. *See, e.g.*, *F-M Potatoes, Inc. v. Suda*, 259 N.W.2d 487, 491 (N.D.

13   1977) (declining to apply the presumption against a bailee in a case involving "perishable

14   goods which ordinarily deteriorate in the course of time from inherent or natural

15   conditions").

16        Regardless of whether a presumption applies, however, a bailor always maintains

17   the initial burden to show that goods were provided to the bailee in good condition and

18   returned in damaged condition. *See Gaudin*, 356 P.2d at 639.[16] *See also Miles v. Int'l*

19

20        [16]The presumption arises because in many jurisdictions, a prima facie case for
21   breach of bailment contract rests only on the bailee's failure to deliver goods as agreed,
     and thus damage to the product preventing redelivery is essentially an excused-
22   performance defense itself dependent on the bailee's exercise of due care. *See Miles*.,
     124 N.E. at 602 (1919) (noting "[t]he effect of [the presumption] is, not to shift the burden
23   of proof from plaintiff to the defendant, but simply the burden of proceeding"). In other
     words, in bailment *contract* actions, the right to recovery is normally predicated on a
24   bailee's failure to deliver the bailment under the contract as agreed—not on a failure to
     exercise due care per se. *See* 8A Am. Jur. 2d Bailments § 237 ("Where the bailor relies
25   on the contract of bailment, and his or her right of recovery is not construed as predicated
     on the bailee's failure to exercise due care, as where the bailor pleads simply the
26   bailment, delivery under the bailment contract, and the failure to redeliver on demand or
     as agreed, without tendering the issue of negligence, the burden of proof to establish a
27   breach of duty, which rests on the plaintiff throughout the trial, is merely the burden of
     showing the bailee's failure to perform the contract to return the property."). The bailee
28   is liable on the contract unless they can offer a lawful excuse for failure to perform,
     including that goods were damaged without their negligence. *See id.*

1   *Hotel Co.*, 124 N.E. 599, 602 (Ill. 1919). As explained in the discussion of breach below,

2   the Court finds genuine disputes of fact as to whether the coffee cherry product at issue

3   was delivered to Leach in good condition and returned in damaged condition. Thus, the

4   Court need not determine whether any presumption applies at this stage in order to rule

5   on the motions, and it declines to do so because the issue involves novel points of Nevada

6   law which may benefit from additional argument at trial.

7         Accordingly, the Court finds that a contract subject to the provisions of NRS §

8   104.7204 exists between Leach and CF USA as a matter of law but defers ruling on the

9   question of whether any presumption applies. The Court now turns to Leach's alleged

10  breach.

11                  **b.**    **Leach's breach**

12        The Court finds that material factual issues remain as to whether Leach's handling

13  of the coffee cherry product breached the contract under the law described above, as to

14  whether any breach caused damage to the coffee cherry flavor profile, and as to whether

15  Leach exercised care in storing the product.

16        First, the record reveals disputed facts about the condition of the coffee cherry

17  when it arrived at Leach. CF USA puts forward evidence from its culinary liaison, Erin

18  Coyle-Brannan, who states that *all* coffee cherry product was subject to flavor and

19  sensory testing and certified as undamaged when it arrived at Leach.[17] (ECF No. 125-

20  13.) However, as Leach notes, hundreds of thousands of pounds of coffee cherry were

21  destroyed due to quality issues after arrival.[18] (ECF Nos. 134-5, 125-14.) More than 50

22

23        [17]Leach objects to use of Coyle-Brannan's declaration as evidence, arguing that it
    should be disregarded because CF USA failed to identify her as a witness until July 2023,

24  after initial witness disclosures and expert witness disclosures were due, in violation of
    Fed. R. Civ. P. 37(c)(1) and 26(a). (ECF No. 134 at 31.) However, parties may supplement

25  their disclosures in a timely manner or as ordered by the court, notwithstanding their initial
    disclosures. *See* Fed. R. Civ. P. 26(e). And at minimum, regardless of her qualification as

26  an expert, Coyle-Brannan has relevant personal knowledge. The Court will thus consider
    the declaration in evaluating the motions.

27

28        [18]Leach contends that not enough product was tested before its arrival at the
    facility to establish its condition, but this goes to the weight of the evidence and the extent
    of damages.

varietals of coffee cherry were stored at the facility, and some of those samples had "savory" profiles before arrival. (ECF Nos. 134-5, 125-14.) Some pre-arrival samples had flavors of "basil," "green leaf," and general herbaciousness, while others were "borderline acceptable" or included a "raw green aggressive flavor." (ECF No. 125-14.) CF USA's expert describes flavors like basil as "off flavors." (ECF No. 134-8.) In addition, it is not clear exactly which lots underwent pre-arrival tested, with some lots missing descriptors altogether. (ECF No. 125-14 at 7.) And the initial organoleptic testing was not blind or conducted under a randomized procedure. (ECF No. 125-19.) Thus, whether and which lots arrived at Leach in acceptable condition is an issue best left for the finder of fact.

Second, and relatedly, material factual questions remain as to whether the coffee cherry was damaged while at the Leach facility. CF USA points to evidence, including October 2020 emails between Brannan, CF USA employees, and several customers, which indicates concern over the "Italian seasoning" and "oregano, bay and paprika" flavor profiles of some new coffee cherry shipments. (ECF No. 125-16.) Customer David Porcher testified in a deposition that the "smaller chop" samples he received had an unsavory profile and that, had previous samples tasted similarly unpleasant, he would have informed CF USA. (ECF No. 125-17.) The ATCO report produced in June 2021 indicates that "[t]he majority of samples submitted are adulterated with a savory aroma and or flavor profile not found naturally in cascara" and that, despite variation in the degree of adulteration, all of the product was likely unusable. (ECF No. 125-19 at 5-7.) CF USA representative Tom Clemente also testified that the Leach facilities were "inundated with Italian seasoning," (ECF No. 125-18 at 5.) He added at that time that he remembered "forming a belief that all the product that we had shipped out of that facility was coming back as tainted." (*Id*.) Leach's own food-science expert, who prepared a report after visiting the Leach facility in November 2021 and noted that "[u]pon entrance to the warehouse, there was an obvious herbaceous scent in the environment," while also noting that the "scent was pleasant and not surprising." (ECF No. 125-20 at 10-11.) Leach's expert does not rule out that the "herbaceous scent" in the environment of the

16

facility may have contributed to a diminished coffee cherry quality, but instead suggests that CF USA should have addressed this issue through its own packaging. (*Id.* at 16-17.) Finally, CF USA points to Leach's corporate representative's deposition statement that after April 2021, while the product remained stored in the Leach facility without payments from CF USA, "to [his] knowledge, there was no value [of the cascara product]." (ECF No. 125-9 at 3.)

Leach points to countervailing evidence calling into question whether damage to the coffee cherry product in fact occurred at its facility. Most importantly, the product was stored at the facility for three to four years and may have deteriorated regardless of any inappropriate conduct on Leach's part. The Leach facility has no temperature or moisture control, and there is some evidence to suggest that loss of moisture could itself impact flavor. (ECF Nos. 134-5, 134-12.) Per CEO Greg Leach's declaration, the product was stored in "jute bags that provide no protection from moisture," as a result of CF USA's own packaging decisions. (ECF No. 134-5.) Leach also offers an expert report suggesting that since the product contains between one and three percent lipids, oxidation impacting flavor would be expected over the course of five to seven years. (ECF No. 134-6.) CF USA requested that Leach destroy over 300,000 pounds of coffee husk after arrival at various times because of deterioration at the facility. (ECF No. 134-5 at 4.) CF USA has indicated that "the product does not have a definitive timeline for how long it will continue to remain food-safe or pass food sensory testing." (ECF No. 134-11 at 4.) In addition, the customers who initially complained about the quality of the product indicated that the new coffee cherry did not look similar to the product they originally received, suggesting that the change in flavor might have been due to inherent characteristics rather than contamination. (ECF Nos. 134-12.) Finally, Leach submits a spreadsheet of Leach inventory, suggesting that CF USA did not test, sample, or inspect 860,000 pounds of unprocessed husk and 87,119 pounds of processed goods out of the 1,060,000 pounds of product at issue in this action before determining that it was unusable. (ECF Nos. 134 at 34, 134-9.)

17

As the Court has previously noted, any burden-shifting presumption that Leach was the cause of damage under Nevada bailment law has not yet arisen and the Court does not decide the issue beyond the extent required in this order. Even so, in light of NRS § 104.7204's requirements, Leach has also affirmatively pointed to pertinent factual issues regarding the nature of its duty under the circumstances and has set forth evidence of its compliance with that duty. *See Miles*, 124 N.E. at 602 (noting that the ultimate burden of proof remains with the party making the claim). For example, Leach points to the report from its expert, Taryn Horr, indicating that FDA health and safety regulations impose relevant standards with which Leach complied. (ECF Nos. 134-3, 134-4.) In that report, Horr emphasizes that Leach is not the coffee cherry brand owner, and thus "many of the aspects of protection of the product are out of its control." (ECF Nos. 134-3, 134-4.) She also notes that CF USA determined the packaging and pallet configuration and ordered storage of the coffee product well past the shelf life included in its Generally Recognized as Safe ("GRAS") notification. (*Id*.) Leach is Safe Quality Food ("SQF") certified. (ECF No. 134-5.) Evidence suggesting that damage may have occurred due to natural deterioration also goes to a factual dispute as to Leach's fault.

CF USA argues, for its part, that the due care required from Leach under the circumstances is evident from discussions between the parties about storage of the product and its sensitivity to odors. (ECF No. 135 at 15.) But the content of these oral discussions—and the extent to which the parties maintained any shared industry understanding of needs for separation between perishable items—is also disputed. Notably, this goes back to the terms of the contract itself, even setting aside the bailment relationship. CF USA's 30(b)(6) witnesses could only testify to a limited extent about the negotiations and agreements between CF USA and Leach, because those initial negotiations were before their time and handled by NohBell.[19] (ECF No. 124 at 15.)

---

[19]Leach argues in moving for summary judgment on CF USA's counterclaim that no evidence of an alleged "material term" that was breached is admissible in the form of testimony from Verkuylen, because CF USA's 30(b)(6) witnesses failed to testify to any such terms and "courts have ruled that because a Rule 30(b)(6) designee testifies on

Verkuylen, the only witness who played a key role in those early oral discussions, testified that per his understanding, Leach was to keep the product separate from odorous products. (ECF Nos. 124-13 at 5, 125-8.) He further testified that he "very discretely and completely conveyed to Leach that our product, Coffee Flour product cannot be exposed to an odorous environment for any length of time." (ECF No. 124-13 at 6.) Belliveau testified that Leach stored and processed many different types of products and appeared to know how to separate products with strong odors. (ECF No. 125-7.) On the other hand, Leach points to Verkuylen's testimony that he *never* negotiated with Leach that it would be responsible for any flavor degradation of the product, or that it would indemnify or hold harmless any results of flavor problems. (ECF No. 124-13 at 5.) And Gary Leach testified that in pre-qualification meetings, nothing about odors was discussed. (ECF No. 124-14 at 3.) Based on this evidence, a trier of fact could reasonably come to different conclusions about both the relevant care required for a warehouse under these circumstances, *and* about the oral terms of this particular contract in relation to that standard.[20]

---

behalf of the entity, the entity is not allowed to defeat a motion for summary judgment based on a[ conflicting] affidavit." (ECF No. 124 at 15.) *See Snapp v. United Transportation Union*, 889 F.3d 1088, 1103-04 (9th Cir. 2018). However, in *Snapp*, the Ninth Circuit cautioned that the proposition that conflicting affidavits should be disregarded should not be overstated: "[I]t applies only where the purportedly conflicting evidence truly, and without good reason or explanation, is in conflict, *i.e.*, where it cannot be deemed as clarifying or simply providing full context for the Rule 30(b)(6) deposition." *See id.* The Court finds that Verkuylen's affidavit adds clarity, rather than conflicts with, the 30(b)(6) depositions and thus considers it in ruling on the motions.

[20]Because the Court has found that the agreement is bailment contract as a matter of law and that NRS § 104.7204 applies to the contours of a warehouse's legal liability, Leach's argument that there is no evidence of a "material term" that was breached is not sufficient alone to justify or defeat summary judgment. *See Chung v. Atwell*, 745 P.2d at 371 (quoting *Pendleton v. Sard*, 297 A.2d 889, 892 (Me.1972)) (finding that, in considering whether parties have mutually assented to a contract, a court should consider "whether the court can 'determine [the putative contract's] exact meaning and fix the legal liability of the parties'"). Leach also cites to *Land Baron Inv. v. Bonnie Springs Fam. LP*, 356 P.3d 511, 517 (Nev. 2015), to suggest that the risk of odors compromising the coffee cherry product was reasonably foreseeable, and thus that the Court "may infer that [CF USA] assumed that risk." (ECF No. 124 at 16.) However, *Land Baron* involved the distinct issue of rescission of a contract due to mutual mistake, and the plaintiff in that case presented no evidence to support its assertion that the defendant had made oral assurances. *See* 356 P.3d at 517.

1    In sum, material factual issues preclude summary judgment for either party on CF

2    USA's breach of contract counterclaim.

3                    **2.    Leach's breach of contract claim (ECF No. 114 at 6)**

4    The Court next addresses Leach's express breach of contract claim, which arises

5    from CF USA's failure to make rental payments after March 2021. Leach contends that

6    CF USA's decision to cease paying for storage while leaving its product in the facility

7    undisputedly breached the terms of the parties' agreement. (ECF No. 126 at 10.) CF USA

8    responds and also moves for summary judgment in its own favor on the basis that it only

9    ceased making payments because Leach had *already* breached the contract by allowing

10   the product to be tainted. (ECF No. 133 at 15.) The Court again rejects both parties'

11   arguments, because whether CF USA breached the contract depends on the same

12   disputed factual question the Court has already discussed—that is, whether Leach

13   breached the contract first.

14   To start, there is no dispute that the contract required Leach to pay for storage of

15   the coffee husk, that CF USA ultimately stopped paying the rental fees without removing

16   the product, or that Leach's lost rental income constitutes quantifiable damages. (ECF

17   Nos. 126-15 at 2-3, 3-7; 126-23.) The only issue remaining is whether CF USA's

18   performance under the contract was excused as a result of a material breach by Leach.

19   *See Cain*, 415 P.3d at 29. The Court has already found that material disputed facts exist

20   as to whether Leach's storage of the coffee husk breached the contract under the Nevada

21   Commercial Code and applicable state bailment law. Leach argues that CF USA waived

22   its ability to claim that performance was excused because it continued paying for storage

23   after learning of damage and thus elected to treat the contract as continuing. (ECF No.

24   134 at 39-40.) This may be true, especially in light of evidence that CF USA discovered

25   damage to its product at the same time its business started to look financially untenable.

26   But this too depends on a disputed timeline for when the alleged damage was discovered

27   and the inferences to be drawn from that evidence. As a result, the Court cannot

28

1    determine as a matter of law whether CF USA's performance was excused and also
2    leaves this question for the finder of fact.

3        The Court thus denies each of the parties' respective requests for summary
4    judgment as to Leach's affirmative breach of contract claim.

5        **B.    CF USA's Contractual Breach of Implied Covenant of Good Faith and
         Fair Dealing Counterclaim (ECF No. 116 at 22-23)**
6

7        CF USA also brings a counterclaim against Leach for contractual breach of the
8    implied covenant of good faith and fair dealing, alleging that "Leach breached its duty to
9    act in good faith when it performed its storage duties in a manner that contravened [CF
10   USA's] reasonably justified expectations under the contract when Leach allowed its
11   facility to be overrun with such a pungent odor that Leach knew would infiltrate and taint
12   [CF USA's] product." (ECF No. 116 at 22-23.) Leach moves to dismiss this claim, arguing
13   it is redundant to CF USA's express breach claim, that equitable relief is improper where
14   parties fail to explicitly contract, and that CF USA cannot establish how Leach engaged
15   in deliberate action satisfying the claim's elements. (ECF No. 124 at 17-20.) CF USA
16   responds that a jury should be permitted to determine disputed facts as to whether
17   Leach's conduct frustrated the spirit of the contract. (ECF No. 132 at 19-21.) The Court
18   denies Leach's Motion.

19       Where one party to a contract "deliberately countervenes the intention and spirit of
20   the contract, that party can incur liability for breach of the implied covenant of good faith
21   and fair dealing." *Hilton Hotels v. Butch Lewis Productions*, 808 P.2d 919, 922-23 (Nev.
22   1991). The covenant "prohibits arbitrary or unfair acts by one party that work to the
23   disadvantage of the other." *State Dep't of Transportation v. Eighth Jud. Dist. Ct.*, 402 P.3d
24   677, 683 (Nev. 2017) (quoting *Nelson v. Heer*, 163 P.3d 420, 427 (Nev. 2007)). Unlike an
25   express breach of contract, a contractual breach of the implied covenant of good faith
26   and fair dealing requires *literal* compliance with the word of the contract. *See Hilton*
27   *Hotels*, 808 P.2d at 922-23. Plaintiffs may plead in the alternative. *See* Fed. R. Civ. P.
28   8(d). But "[i]t is well established that a claim alleging breach of the implied covenants of

                                          21

good faith and fair dealing cannot be based on the same conduct establishing a separately pled breach of contract claim." *A.C. Shaw Constr. v. Washoe Cty.*, 784 P.2d 9, 9 (Nev. 1989). *See also Shaw v. CitiMortgage, Inc.*, 201 F. Supp. 3d 1222, 1251 (D. Nev. 2016) (finding that a defendant's direct and actual breach of a contract could not support an implied covenant claim).

To start, the Court notes that CF USA's implied covenant claim may not improperly rest on the same facts as its express breach claim to survive summary judgment. *See A.C. Shaw*, 784 P.2d at 9. Importantly, the Court has found in this order that Leach may be *directly* liable for a contractual breach where it causes losses by its failure to exercise the care reasonable under the circumstances. *See* NRS § 104.7204(1). As a result, CF USA *cannot* simply rely on the same duty under NRS § 104.7204 and the same conduct allegedly violating this duty to support its implied covenant claim. Of course, this is a significant limitation. Nevertheless, the Court finds that the CF USA's implied covenant claim is broader than its express breach claim and is not merely superfluous. *See Guz v. Bechtel Nat. Inc.*, 8 P.3d 1089 (Cal. 2010) (finding an implied covenant claim superfluous when it completely overlapped with an express breach claim). CF USA's express breach claim rests on the allegation that damage "caused the total loss of the product while in Leach's possession and control." (ECF No. 116 at 21-22.) CF USA also specifically alleges as part of that claim that Leach failed to adhere to "proper industry standards." (*Id*.) The implied covenant claim, by contrast, rests on CF USA's reasonable and justified expectations of Leach's storage duties under the contract. (*Id*.) Here, even if no express contractual terms as to storage were imposed by the original oral discussions between the parties, a reasonable trier of fact could find that Leach nonetheless frustrated the basic purpose of the agreement to maintain the product in marketable condition, given its sensitive nature. This could be true even if CF USA met industry standards and acted with care that would ordinarily be reasonable for public warehouses, defeating an express breach claim. *See, e.g.*, *Carr v. W. Side Warehouse Co.*, 169 N.Y.S. 564, 565 (App. Term 1918) (rejecting a bailment claim where it was not customary to cover turnips in zero-

degree weather, and therefore no contractual obligation was breached in relation to the turnips). CF USA points to evidence that CF USA informed Leach that the product could be easily contaminated. (ECF No. 132 at 20.) Leach itself emphasizes that "[e]very witness for CF USA has testified that its product is particularly susceptible to picking up foreign smells" and thus that "special, not ordinary care is required for that product." (ECF No. 136 at 19.)

Moreover, the Court is not persuaded by Leach's argument that CF USA's implied covenant claim attempts to impose new substantive obligations into the contract, when such obligations should have been expressly negotiated. It is true that a party may not use an implied breach claim to impart additional obligations not contemplated in the operative contract, but an implied breach occurs where one contracting party "unfairly frustrate[s] the other party's right to receive the *benefits of the agreement actually made*." *See Guz*, 8 P.3d at 1109-10 (emphasis in original). Here, the benefits of the agreement clearly include, for CF USA, having product fit for sale when it leaves the facility; this is not an "extra" obligation of the type prohibited in the cases Leach cites for support. *See id.* (finding that an employee challenging his dismissal under an at-will contract could not use the implied covenant to support due process requirements beyond those included in the contract, where the plaintiff had received the full benefit contemplated by the contract).

Leach further argues that CF USA could have and should have expressly negotiated storage terms, given that it knew the coffee cherry product was uniquely susceptible to contamination. (ECF No. 124 at 18.) But authority on this point does not suggest that a party to a storage contract is required to contract for every conceivable scenario that could arise to damage goods and frustrate the central purpose of the contract. *See, e.g.*, *State Dep't of Transportation*, 402 P.3d at 683 (finding that a plaintiff could have addressed concerns with publicly-available flyover plans through contract when those flyover plans ultimately impacted appraisal values, several degrees removed from the benefits conferred by the contract itself). In addition, while Leach argues that there is no evidence of deliberate conduct frustrating the spirit of the contract, CF USA

1    points, for example, to the testimony that Leach's facilities were inundated with a scent of

2    Italian seasoning potent to visitors as well as testimony from Leach's expert as to the

3    "obvious herbaceous scent in the environment." (ECF No. 132 at 20.) A trier of fact could

4    reasonably conclude, based on the intensity, that Leach was aware of increasing odors

5    in its warehouse and the impact on the coffee cherry product, and that as a result its

6    storage of the coffee cherry without precautions amounted to deliberate conduct.

7            The Court thus denies Leach's request for summary judgment. However, the Court

8    again cautions that the contours of this surviving claim are narrow and that CF USA may

9    not later rely on the same "duty under the circumstances" supporting its express breach

10   of contract claim.

11           **C.    Damages**

12           Separate from its analysis of the other claim elements, Leach also argues that

13   summary judgment in its favor is proper as to CF USA's counterclaims because CF USA

14   has failed to prove damages. (ECF No. 124 at 20-29.) Leach asserts that CF USA cannot

15   sustain its burden here because (1) CF USA only sampled a small percentage of the lots

16   suspected to have issues; (2) the testing and sampling that was done is insufficient to

17   extrapolate the results to the remainder of the lots; and (3) CF USA cannot establish that

18   it owned the coffee husk in question. (*Id.* at 20.) CF USA responds that any flaws in

19   sampling procedures go to the extent of damages or to CF USA's failure to mitigate

20   damages—not to the mere existence of damages at the summary judgment stage—and

21   that CF USA is in fact the owner of the product. (ECF No. 132 at 21.) The Court agrees

22   with CF USA.

23           To prevail on its counterclaims, CF USA must prove both the existence and the

24   amount of damages. *See Intel Corp. v. Terabyte Int'l, Inc.*, 6 F.3d 614, 621 (9th Cir. 1993).

25   Summary judgment is appropriate if the jury would be left to "speculation or guesswork in

26   determining the amount of damages to award." *Weinberg v. Whatcom Cnty.*, 241 F.3d

27   746, 751 (9th Cir. 2001). However, an injured party need not "prove its damages with

28   mathematical precision; it need only establish a reasonable basis for ascertaining those

24

1   damages." *Cent. Bit Supply, Inc. v. Waldrop Drilling & Pump, Inc.*, 717 P.2d 35, 37 (Nev.

2   1986).

3       Most of the procedure CF USA used for post-adulteration sensory testing is clear

4   from the record. CF USA took samples from 12 out of 56 total lots. (ECF Nos. 124, 125.)

5   From most of these lots—which ranged in size from 3 to 696 bags—CF USA took two

6   samples. (ECF No. 124-18 at 10.) Per Tellin's June 2021 report, two-gram portions from

7   each larger sample were tested. (*Id*.) Tellin testified in his deposition that he did not tell

8   CF USA specifically how to sample the product—only that CF USA needed to collect the

9   samples from multiple points. (ECF No. 124-22 at 4-5.) Two of the lots tested were found

10  to be "characteristic" without adulteration. (ECF Nos. 124 at 23, 124-18.)

11      Leach argues that CF USA admits to never testing a majority of the product stored

12  at Leach and that results from the limited sampling that did occur cannot be extrapolated

13  to the untested coffee cherry without "pure speculation." (ECF No. 124 at 21-22.) Leach

14  specifically contends that CF USA's sampling does not satisfy Tellin's own minimum

15  standards, because CF USA itself hand-picked only small samples from specific lots for

16  testing. (*Id*.) Nor does the testing satisfy industry standards, Leach further argues,

17  because CF USA has not identified any model protocols and cannot otherwise present

18  competent expert evidence to validate its sampling. (ECF No. 124 at 23-25.) The Court

19  agrees with CF USA that these asserted flaws in CF USA's testing go to the extent of

20  damages and not to whether Leach has met its burden to provide evidence that CF USA

21  incurred damages.

22      First, Leach does not cite to any legal authority suggesting that *any* sampling—let

23  alone sampling according to a specific procedure—is required to establish the existence

24  of damages.[21] Leach points to Tellin's testimony that while he did not select the samples

25

26      [21]Leach indicates that it plans to file a motion to exclude Tellin's findings based on "faulty sampling, lack of blind testing, lack of validation testing, and the failure to preserve the product." (ECF No. 124 at 22 n. 84.) In its other filings, Leach also objects to the report as hearsay, and states that while the report may be subject to Tellin's own personal testimony, Leach will seek to preclude his expert testimony under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). (ECF No. 134 at 28-29.) However, Leach

he tasted, if he were to select samples himself he would likely aim to test ten percent of identified bags and that sampling might be needed for every bag in order to affirmatively establish adulteration. (ECF No. 124-22 at 5-6.) Leach also points to evidence that, per Leach's food science expert, Tellin's sampling did not utilize a statistically valid sampling method or comply with the standards set forth in the FDA's Investigation Operations Manual, which includes a "square root" sampling protocol and an alternative standard for coffee. (ECF No. 124-23 at 2.) And Tellin stated in May 2021 communications that "[CF USA's] aim isn't to prove some of the material is good, but that all is bad." (ECF No. 124-21 at 3.) But at minimum, Tellin's report does arguably support that some small samples had contaminated flavor profiles at the time of testing. Even if the scientific extrapolations that can properly be made from these findings are severely limited—and damages limited as a result—that is still a question as to the amount of damages, and not one based purely on speculation or guesswork.

Moreover, although Leach emphasizes the bias in CF USA's testing and asks the Court to refrain from considering the contents of Tellin's report altogether, Leach frames the nature of the report and the question of scientific validity narrowly. Here, it is important not merely whether all of the coffee cherry was damaged to a scientific certainty, but also how much product CF USA could have reasonably concluded was adulterated. In its rebuttal, CF USA points to Coyle-Brannan's declaration suggesting that CF USA representatives and employees are prepared to testify that after a six-month investigation they had no confidence the coffee cherry remaining at Leach could be commercially viable and Leach's 30(b)(6) witness's testimony that after April 2021, the coffee cherry product had no value. (ECF No. 132.) The ATCO report indicates that "while some samples are more adulterated than others, it is the opinion of ATCO that the material

---

has not filed a motion to exclude or otherwise addressed the factors for establishing reliability under *Daubert*. More importantly, Tellin's report has evidentiary value independent of its scientific merit; the report may be relevant to CF USA's behavior and the reasonableness of its actions. The report's role in the litigation is not, therefore, the same as that of most expert reports, and the Court will not summarily exclude the report without further argument.

represented by the samples is not commercially usable by any beverage manufacturer . . . [w]hile thorough sampling and evaluation could determine if usable material exists within the inventory of affected cascara, it is not economically feasible to determine, segregate and verify." (ECF No. 124-18 at 3.)

The Court cannot conclude that CF USA suffered no damages simply because more product was not tested. *See Cent. Bit Supply*, 717 P.2d at 37 (noting that a party need not prove its damages with mathematical precision). CF USA has also disclosed documents and damages calculations based on the cost of acquiring the product and the cost of replacement; the Court further concludes that a factfinder tasked with calculating damages would not be required to resort to pure speculation.

Leach's argument that CF USA fails to demonstrate ownership of the coffee cherry also fails. Leach asserts that CF USA's parent company—CF Global—is the true owner of the goods and frames this issue as alternatively an issue of standing to assert damage to the property of another, or simply as a failure of proof to establish the elements of CF USA's claims. (ECF No. 124 at 25-27.) It is true that, as the Court has repeatedly noted, a party cannot claim damages in the form of the value of the property one does not own. (ECF No. 83.) Indeed, confusion about the corporate relationship between CF USA, CF Global, and the fictitious "Coffee Cherry Company" has continued throughout this litigation, and the Court has previously directed Defendants/counterclaimants to provide clarity with limited success, even as discovery has advanced. (ECF Nos. 57, 83.) The Court has also rejected an affirmative "alter ego" theory based on alternative or shared liability between CF USA and CF Global. (ECF No. 110.)

Despite this history, the Court must view the record in the light most favorable to CF USA, and doing so finds sufficient evidence of CF USA's ownership for its counterclaims to survive summary judgment. Leach primarily argues that the original supply agreements with coffee producers Mercon and Ecom named only CF Global as a party. (ECF No. 124 at 25-27.) CF Global and Leach's 30(b)(6) witnesses each testified that CF Global exchanged a portion of its own shares to establish the supply arrangement,

and Leach makes much of the fact that these shares served as the only consideration for the deal. (ECF No. 124-7, 124-8.) Leach insists that because CF Global was the party to these supply agreements and there is no clear documentation of CF USA's subsequent purchase or acquisition of the husk from CF Global, CF USA has never owned the husk. But Leach does not cite any specific legal authority to suggest that a subsidiary's ownership of goods requires that they acquire those goods in a particular manner. And CF USA presents rebuttal evidence that CF Global *and* the other parties to the original supply agreement entered that agreement and proceeded under it for years with the impression that CF USA owned the product stored at Leach and was the contracting party in interactions with Leach.[22] (ECF Nos 125-7, 125-21.) CF USA's strongest evidence is that, Juan Ibarra, both the Chief Operating Officer of Mercon and a *director of CF Global*, indicates that he believed that the product was owned by CF USA. (ECF No. 125-21 at 3.) And when the coffee cherry product was shipped to the United States, Mercon delivered the product to CF USA and directly invoiced CF USA for the costs of shipment.[23] (ECF No. 125-21 at 3.) Taken together, CF USA has pointed to adequate evidence of a

---

[22]In its rebuttal, CF USA points to Belliveau's testimony that while the initial storage agreement with Leach was negotiated by NohBell, CF USA was formed as an independently staffed and funded company (ECF No. 125-7 at 37-38.) The Chief Operating Officer of Mercon and director of CF Global Juan Ibarra states in a declaration that while Belliveau's initial plan was for Mercon or Ecom to take over the management of the coffee cherry product, rather than move forward with a separate company, he objected to that plan and proposed a stand-alone company. (ECF No. 125-21 at 3-4.) Because the business needed to have a United States arm, Ibarra "agreed that the company formed in the United States should handle all operations, including hiring and handling all expenses related to the processing, shipping, and storing of the coffee cherry product." (*Id.* at 2.) Carole Widmayer, current CEO of CF USA, similarly states in an affidavit that Ecom and Mercon agreed that the product should be managed by a standalone company, and that CF USA was formed on February 4, 2015, by Ecom attorneys. (ECF No. 125-2 at 4.)

[23]CF USA also submits shipping documents and bills of lading in its opposition, which Leach objects to as inadmissible evidence because they are not authenticated and contain hearsay. (ECF No. 136 at 14.) Leach also argues that the documents fail to account for the ownership of at least 37 of 59 discrete lots. (ECF Nos. 136 at 14, 136-2.) Given the other rebuttal evidence, the Court will not make a finding as to the admissibility of the shipping documents in this order.

1  factual ownership issue to defeat Leach's motion. Leach may still argue at trial that CF

2  USA cannot prove its ownership of specific lots based on missing shipping documents.[24]

3  Finally, Leach argues in its reply to CF USA's opposition, that the Court should

4  grant summary judgment for discreet lots, cross-referencing ownership documents with

5  pre-arrival sensory testing documents and adulteration testing samples. (ECF No. 136.)

6  Leach emphasizes that all three sets of documents exist for only one lot—and that even

7  this single lot lacks adequate admissible proof of ownership and suggests sampling

8  shortcomings. (*Id.*) The Court finds that Leach may, of course, present its cross-

9  references to the finder of fact, but that it is unnecessary and confusing to subdivide lots

10  at the summary judgment stage, especially because the Court has already concluded that

11  genuine factual issues exist about the adequacy of pre- and post-sensory testing. An

12  evaluation of which lots should be excluded from calculation of damages is a question

13  better addressed at trial, after resolution of these underlying factual issues.

14  In sum, the Court also denies Leach's request to for summary judgment as to CF

15  USA's counterclaims on the basis of failure to prove damages.

16  **D.    Leach's Claim for Fraud in the Inducement (ECF No. 114 at 7-10)**

17  Leach moves for judgment in its favor as to its affirmative claim for fraud in the

18  inducement, with the quantum of damages to be determined at trial. (ECF No. 126 at 11-

19  12.) CF USA also moves for judgment as a matter of law. (ECF No. 125 at 23-25.) The

20  Court grants summary judgment for CF USA.

21  Leach contends that CF USA misrepresented that it could manufacture, process,

22  and distribute one million pounds of its product through Leach each year, inducing Leach

23  to enter into an agreement under which it provided particularly favorable rates. (ECF Nos.

24  114 at 7; 126 at 11-12.) To prove fraud by inducement, Leach must demonstrate by clear

25

26  _____

   [24]In its previous discussions of the attempted use of the alter ego theory, the Court
27  expressed particular concerned because it appeared counterclaimants were attempting
   to blur together different corporate entities to expand and create alternate theories of
28  liability. (ECF Nos. 83, 109, 110.) That concern does not apply here, given that CF USA
   is the only named counterclaimant and there is no risk of swapping in an alternative party
   if CF USA fails to convince the finder of fact of its ownership of the husk.

1    and convincing evidence (1) a false representation made by CF USA; (2) CF USA's

2    knowledge or belief that the representation was false (or knowledge that it had insufficient

3    basis for making the representation); (3) CF USA's intention to induce Leach to consent

4    to the contract's formation; (4) Leach's justifiable reliance upon the misrepresentation;

5    and (5) damage to Leach resulting from such reliance. *See J.A. Jones Constr. Co. v.*

6    *Lehrer McGovern Bovis, Inc.*, 89 P.3d 1009, 1018 (2004).

7         Here, Leach fails to raise a genuine issue as to the first and second elements—

8    that CF USA made a false statement and did so knowingly. In general, "[t]he mere failure

9    to fulfill a promise or perform in the future . . . will not give rise to a fraud claim absent

10   evidence that the promisor had no intention to perform at the time the promise was made."

11   *Bulbman, Inc. v. Nev. Bell*, 825 P.2d 588, 592 (Nev. 1992). In *Bulbman*, which involved a

12   company's representations about the installation time for its telephone system, the

13   Nevada Supreme Court reasoned that a discrepancy between promise and performance

14   did not rise to the level of fraud because there was no evidence that the defendant had

15   "no intention to perform at the time the promise was made." *Id.* Granting summary

16   judgment for the defendant, the *Bulbman* Court further found that in order to demonstrate

17   fraud, a plaintiff must show intentional wrongful conduct. *See id.* The *Bulbman* court's

18   reasoning also applies here.

19        Leach does not point to evidence suggesting that CF USA never *intended* to

20   perform or misrepresented its limited sales history. *See id.* Indeed, the record suggests

21   that CF USA may have made unrealistic—perhaps even egregiously so—predictions

22   about the commercial viability of an unvetted product new to the large-scale market. But

23   this is a familiar scenario across many start-up ventures, and lack of prior sales data does

24   not make inaccurate predictions material misrepresentations. Leach presents evidence,

25   for example, that CF USA had no sales commitments, contracts, or guarantees that they

26   could fulfill its plans. (ECF Nos. 126-10 (30(b)(6) witness describing initial business

27   projections as "fanciful" and "unrealistic"), 126-5 (former CEO confirming that CF USA

28   targeted big businesses without having commitments on sales or future business and that

the plan and focus was product development, although the company was looking for sales), 126-4 (suggesting that in 2015, there was planning, capability, and supply in the millions of pounds, but no identified customers paying for it or commitments on the product)). None of this indicates that CF USA knowingly presented false information to Leach. In initial communications, CF USA did not commit itself to a specific or inaccurate volume estimate. Verkuylen sent an email to Leach representatives in June 2015 stating, "currently we are looking at 1 mm lbs, but *not all of that will come to the US*." (ECF No. 125-11 at 5 (emphasis added).) Belliveau testified that "the goal was always how can we process billions of pounds, not millions of pounds" and that CF USA was actively looking for sales (ECF No. 126-5 at 4), and Widmayer testified as to the "learning curve" for CF USA as a new company (ECF No. 126-10 at 6-7). In addition, there is evidence that this sales model was based on review of the relevant market. For example, Verkuylen testified that in order to seek deals with large companies, CF USA believed that it needed to demonstrate it had the infrastructure to ramp up. (ECF No. 126-4 at 9-10.)

While Leach argues that it is fraud to intend to perform when there is knowingly no basis to achieve such performance, its cited authority from other circuits on this point is unavailing because CF USA did not misrepresent its *current* assets or income. *See Cohen v. Koenig*, 25 F.3d 1168, 1172 (2d Cir. 1994) (finding fraud where defendants overstated their current net income, value of assets, and the value of property and equipment). Leach further argues that "the mere nondisclosure of material facts can be a form of misrepresentation where the defendant has concealed a known fact that is material to the transaction." *Felonenko v. Siomka*, 637 P.2d 1338, 1340 (Or. 1981). But in this case, it is not clear what exactly CF USA concealed or was required to disclose. It was never a secret that "coffee flour" is not a tried-and-true market staple. No evidence suggests that Leach sought information about CF USA's past sales or required extensive details about its volume projections. (ECF No. 125-11 at 5.)

Most importantly, Leach's own corporate representative testified that more than a million pounds of coffee cherry product *was in fact* ultimately stored at Leach's facility.

31

(ECF No. 125-9.) Leach does not dispute this but instead argues that CF USA communicated plans to *process and turn over* millions of pounds of product—and that Leach never expected large quantities to sit unused in the warehouse. Here, Leach makes much of "undisputed evidence . . . that long-term storage of millions of pounds was never discussed during [initial] meeting in 2015." (ECF No. 137 at 12.) But this goes both ways: it also suggests in part that CF USA never disclaimed the possibility of long-term storage. And regardless, the fact that a high-volume of product arrived at the warehouse indicates that CF USA did not misrepresent its intention to mill and distribute that amount—even if that plan was patently over-ambitious.

In sum, the Court finds no genuine dispute that CF USA did not knowingly misrepresent material facts to Leach. *See J.A. Jones*, 89 P.3d at 1018. The Court need not address the fraud claim's other elements. Accordingly, the Court denies Leach's request for summary judgment on its fraudulent inducement claim and grants CF USA's opposing motion for summary judgment on the same claim.

**E.    Leach's Claim for Unjust Enrichment (ECF No. 114 at 10)**

Leach further asserts that summary judgment is warranted on its unjust enrichment claim because of the undisputed costs it incurred for continued storage and disposal after CF USA abandoned its product at the Leach facility. (ECF No. 126 at 12.) The Court finds that CF USA successfully rebuts Leach's Second Motion as to this claim.

Unjust enrichment is "the unjust retention . . . of money or property of another against fundamental principles of justice or equity and good conscience." *Asphalt Prod. Corp. v. All Star Ready Mix, Inc.*, 898 P.2d 699, 701 (Nev. 1995). A plaintiff must establish that (1) plaintiff conferred a benefit on defendant; (2) defendant appreciated such benefit; and (3) defendant accepted and retained the benefit. *See Topaz Mut. Co. v. Marsh*, 839 P.2d 606, 613 (1992). "An action based on a theory of unjust enrichment is not available when there is an express, written contract." *Leasepartners Corp. v. Robert L. Brooks Tr.*, 942 P.2d 182, 187 (Nev. 1997). *See also Lipshie v. Tracy Investment Co.*, 566 P.2d 819,

824 (Nev. 1977) ("To permit recovery by quasi-contract where a written agreement exists would constitute a subversion of contractual principles.").

In April 2021, CF USA indicated through its attorneys that it was formally terminating its relationship with Leach and warned Leach not to destroy the product currently stored at the facility because it constituted evidence for any future litigation. (ECF No. 126-24.) Leach subsequently demanded that CF USA pay past storage fees and remove its product from the facility. (ECF No. 126-25.) In May 2021, CF USA responded that it would not be paying storage fees or "making arrangement to collect contaminated materials" rendered valueless. (ECF No. 126-27.) In further communications about disposal, CF USA continued to cite the duty to preserve evidence for litigation. (ECF Nos. 126-28, 126-29.) After the parties failed to reach an agreement, Leach filed a motion for leave to dispose of the product, which the Court granted in November 2022. (ECF Nos. 39, 43, 44.) Leach began disposal and incurred related costs. (ECF No. 126-32.)

As a threshold matter, because unjust enrichment permits recover by quasi-contract only where an express contract does not exist, Leach's unjust enrichment claim can only survive to the extent it seeks recovery for costs outside the coverage of the express contract providing for storage payments. *See Leasepartners Corp.*, 942 P.2d at 187. As CF USA itself states, however, CF USA formally terminated "any agreement, whether oral or written with Leach for . . . storage, warehousing, or milling services" in April 2021. (ECF No. 126-24.) Because costs for this storage and disposal following the termination were not directly contemplated by the prior agreement, the Court finds that Leach is not precluded from bringing an unjust enrichment claim altogether on this basis.[25]

---

[25]The Court nevertheless cautions that, to the extent damages related to disposal of the coffee husk are included in an express breach claim, no overlapping relief on an unjust enrichment theory is appropriate. *See Lipshie*, 566 P.2d at 824 (prohibiting subversion of contractual principles).

Nevertheless, the Court identifies material disputed facts as to whether Leach conferred a benefit which CF USA unfairly retained. This question depends in large part on the disputed evidence already discussed going to whether and how much of the coffee cherry product was in fact destroyed, and Leach's fault or lack of fault. Leach argues that regardless of the merits of the parties' contract claims—and regardless of any damage to the coffee cherry—CF USA undeniably received a benefit from Leach's continued storage of the husk as evidence for litigation. (ECF No. 137 at 16.) But if the factfinder determines that significant amounts of the product was destroyed—and this foundational loss leading to the need for evidence is Leach's fault—it is not clear how Leach simultaneously conferred a recoverable benefit to CF USA in the form of storage of that evidence. *See Topaz*, 839 P.2d at 613. Issues of equity arise if a party is required to pay for the removal of goods rendered valueless by the opposing party. *See Las Vegas Fetish & Fantasy Halloween Ball, Inc. v. Ahern Rentals, Inc.*, 182 P.3d 764, 766 (Nev. 2008) (noting that the unclean hands doctrine generally bars equitable relief because of a party's own inequitable conduct).

Accordingly, the Court denies Leach's request for summary judgment on its unjust enrichment claim.

## F.    Leach's Claim for Trespass (ECF No. 114 at 10-11)

Finally, Leach moves for summary judgment on its trespass claim, asserting that the continued presence of the coffee husk at its warehouse after it revoked permission constitutes trespass as a matter of law. (ECF No. 126 at 15-18.) The Court denies Leach's motion.

Trespass liability exists if a party "intentionally (a) enters land in the possession of the other, or causes a thing or a third person to do so, or (b) remains on the land, or (c) fails to remove from the land a thing which he is under a duty to remove." *Iliescu Tr. v. Reg'l Transportation Comm'n of Washoe Cnty.*, 522 P.3d 453, 461 (Nev. App. 2022). Under the Second Restatement of Torts, "one whose presence on the land is not caused by any act of his own or by a failure on his part to perform a duty is not a trespasser."

1  Restatement (Second) of Torts § 158 cmt. f (1965). However, the Restatement further

2  indicates that "[i]f a chattel belonging to the actor which is on land in the possession of

3  another has been bailed to the other by the actor or his predecessor in legal interest, the

4  actor's failure to remove the chattel from the bailee's land is not a trespass, even though

5  at the time of the bailment it was agreed that the bailment was to be terminated and the

6  chattel retaken by the bailor at a given time or at the bailee's request." *Id.* at § 160 cmt. n

7  (1965).

8  In moving for summary judgment on its trespass claim, Leach largely points to the

9  same facts underlying its unjust enrichment argument, *i.e.*, the series of communications

10 indicating that CF USA failed to remove coffee husk from the warehouse in 2021. (ECF

11 Nos. 126 at 15, 126-24, 126-25, 126-26, 126-27, 126-28, 126-29.) Leach also argues that

12 CF USA's decision to abandon the product at Leach was undisputedly intentional, given

13 that CF Global's Board of Directors voted on the issue. (ECF No. 126-22.) And Leach

14 highlights emails from in which CF USA refused to remove the coffee husk unless Leach

15 stipulated that neither party would argue spoliation at trial. (ECF. No. 126-30.)

16 In its opposition, CF USA first argues that Leach's trespass claim fails as a matter

17 of law, given the Restatement's provision that when a bailment exists, a bailor is not liable

18 in tort for its failure to remove bailed property. The Court has already established that the

19 contract created a commercial bailment relationship under Nevada law. Legal authority

20 on the application of Section 160 is sparse, and neither Leach nor CF USA point to

21 controlling authority from this circuit. CF USA primarily relies on *Manor Enterprises, Inc.*

22 *v. Vivid, Inc.*, 596 N.W.2d 828, 834 (Wis. Ct. App. 1999). But in *Manor Enterprises*, the

23 Wisconsin appellate court *declined* to apply the comment on bailment to dismiss the

24 trespass claim, finding limited precedent to do so and noting the bailment at issue

25 appeared to have been terminated. *See id.* The *Manor Enterprises* court further noted

26 that the reasoning behind the Restatement comment is that there generally exists "a

27 contractual remedy for the bailee when the bailor refuses to remove the bailed property

28 and the bailee no longer wants possession and control of it," but "[t]he purpose of the

exception is not to deprive a landowner of a remedy in trespass when there is no express contractual provision obligating the bailor to remove the property." *Id.* at 836. Here, neither CF USA nor Leach have argued if or how the existing storage contract obligates removal, although the Court notes that Leach may be able to recover for some disposal costs as consequential damages under its express breach claim. In addition, neither party cites to any law arising under states' versions of the UCC or pertaining to commercial warehouse contracts, pointing only to cases involving the interaction between common-law bailment and the Restatement of Torts.[26] The Court denies Leach's request for summary judgment.

Nevertheless, there remain genuine questions of material fact as to trespass liability mandating denial of Leach's motion on this cause of action. Centrally, under bailment law the *bailee* has an obligation to return goods in undamaged condition. *See Manhattan Fire & Marine Ins.*, 9 P.2d at 683. And in general, "one whose presence on the land is not caused by any act of his own or by a failure on his part to perform a duty is not a trespasser." Restatement (Second) of Torts § 158 cmt. f (1965). While Leach argues that its trespass claim survives regardless of any flavor deterioration, this does not square with division of obligations between bailors and bailees under these contract and tort principles. Disputes of fact exist as to whether the coffee cherry product was damaged, whether Leach caused this damage, and whether Leach exercised the requisite care. These factual issues impact whether Leach breached its obligation to return the goods, and in turn whether CF USA had any remaining duties in the relationship. And again, equity issues would arise if bailors responsible for destroying items in their possession could regularly sustain tort actions against bailees even after being found wholly at fault.

Accordingly, the Court denies Leach's motion for summary judgment on its trespass claim.

---

[26]In general, the Court does not address the provisions of the NRS § 104 that apply to warehousers, but which are not discussed in the motions before it. However, the Court notes that NRS § 104.7206 provides for termination of storage at a warehouse's option. Relatedly, other provisions of the section address ownership of goods.

## IV.    CONCLUSION

The Court notes that the parties made several arguments and cited to several cases not discussed above. The Court has reviewed these arguments and cases and determines that they do not warrant discussion as they do not affect the outcome of the motions before the Court.

It is therefore ordered that Leach's motion for summary judgment as to CF USA's Second Amended Counterclaim (ECF No. 124) is denied.

It is further ordered that Leach's motion for summary judgment as to its claims for breach of contract, fraudulent inducement, unjust enrichment, and trespass (ECF No. 126) is denied.

It is further ordered that CF USA's motion for partial summary judgment (ECF No. 125) is granted in part and denied in part. The motion is granted as to Leach's claim for fraud in the inducement and denied as to the other claims identified therein.

It is further ordered that Leach's motion for leave to file separate motions (ECF No. 123) is granted.

It is further ordered that this case is referred to the Magistrate Judge to conduct a settlement conference. The proposed joint pretrial order is due 30 days from the settlement conference, assuming a resolution is not reached.

DATED THIS 27th Day of September 2024.

MIRANDA M. DU
CHIEF UNITED STATES DISTRICT JUDGE